**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CITADEL GROUP LIMITED,<br>a Delaware corporation, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant | ) | Case No. 07-cv-1394 |
| | ) | |
| vs. | ) | |
| | ) | |
| WASHINGTON REGIONAL MEDICAL<br>CENTER, an Arkansas not-for-profit corporation, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

This dispute between Washington Regional Medical Center ("WRMC") and Citadel

Group Limited ("Citadel") pertains to the development of a medical office building ("MOB") in

Springdale, Arkansas. WRMC moves for partial summary judgment on Count II of Citadel's

amended complaint. (Dkt. No. 124.) In Count II, Citadel seeks lost profits arising from

WRMC's alleged breach of an agreement between them. (Dkt. No. 63.) We grant WRMC's

motion.

## I. FACTUAL BACKGROUND

WRMC is an Arkansas not-for-profit corporation that operates medical facilities in that

state. (Def.'s 56.1 Facts ¶ 1.) Citadel is a Delaware corporation headquartered in Chicago,

Illinois and engaged in real estate development with a focus on the healthcare industry.[1]  (*Id.* ¶ 2.)  On September 15, 2005, WRMC signed an agreement with Citadel relating to the development of the MOB.  (*Id.* ¶ 16.)  The scope of the agreement between WRMC and Citadel is at issue here.  We begin by laying out the facts.[2]

## A.  WRMC's Request for Proposal and Citadel's Proposal

In early 2005, WRMC was considering developing a MOB in Springdale, Arkansas on property owned by its affiliate, the Washington Regional Foundation.[3]  (Def.'s 56.1 Facts ¶ 4; Hutchison Dep. at 36; Bradley Dep. at 21–23.)  WRMC initially sought to develop the MOB through a lease-back arrangement with an outside developer.  (Pl.'s 56.1 Facts ¶ 1.)  Through this arrangement, WRMC would execute a long-term ground lease on the property with the developer, who would then build the MOB, retain ownership of it, and lease back space in the MOB to WRMC.  (*Id.*)  WRMC sought this type of arrangement in order to develop the MOB without adding substantial debt to its balance sheet.  (*Id.*)  At the time, WRMC's Chief

---

[1]  Because the parties are diverse and the amount in controversy exceeds $75,000, we have jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

[2]  WRMC moved to strike Citadel's response to WRMC's local rule 56.1 statement of undisputed facts.  (Dkt. Nos. 140–41.)  Although many of the arguments WRMC raised in its motion are persuasive, we find it unnecessary to strike Citadel's entire response.  Instead, having thoroughly reviewed the record, we have identified those facts that are undisputed as needed.  To the extent Citadel improperly denied certain statements of fact in its local rule 56.1 response, our reliance on those facts indicates that we have deemed them admitted.  *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).  When necessary, we have also identified facts about which there are genuine disputes.  As we discuss below, however, these disputed facts are not material.

[3]  WRMC and the Washington Regional Foundation are both part of the broader Washington Regional Medical System, a non-profit organization which includes numerous medical facilities throughout northwest Arkansas.  (Bradley Dep. at 21–23.)  Like the parties, we refer to these various entities as WRMC except when further specificity is necessary.

Executive Officer ("CEO"), William Bradley, was concerned that WRMC's "debt load was high." (*Id.*)

Seeking this type of arrangement, WRMC's Senior Vice President, Tami Hutchison, who Bradley had placed in charge of the project, issued a "Request for Proposal" ("RFP") on April 26, 2005 to eight developers, including Citadel. (*Id.* ¶ 2.) The RFP indicated that WRMC was interested in executing a "long-term ground lease" with a developer for the purpose of developing a 30,000 square foot medical facility in which WRMC would then lease a portion of the space for a primary care practice. (*Id.* ¶ 3.) Some of the remaining space would be pre-leased for use as an ambulatory surgery center and an orthopedic clinic. (Dkt. No. 137–9 at 4–5.) Under a heading titled "[e]stimated ground lease rate and terms," the RFP stated that WRMC was "propos[ing] a 30-year lease" at $1,812 per month for the first ten years, $1,993 per month for the next ten years, and $2,192 per month for the last ten years. (*Id.* at 5.) The RFP also identified certain "Requested Terms" to be included in the proposals, specifically the "[p]roposed lease rate and [o]ther [l]ease [t]erms." (*Id.*)

On May 13, 2005, Citadel submitted a proposal in response to the RFP. (Def.'s 56.1 Facts ¶ 5.) The first section of the proposal was a proposal letter with an appended "Authorization to Proceed" identical in all but one line to the "Authorization to Proceed" WRMC would later sign. (Dkt. No. 137–9 at 11–12; Def.'s 56.1 Facts ¶ 12.) The second section of the proposal was a three-page "Preliminary Leasing Terms Sheet" ("Terms Sheet"). (Def.'s 56.1 Facts ¶ 6.) The Terms Sheet began by stating:

> The following terms reflect interest rates as of May 9, 2005. This terms sheet is subject to credit review, commitments committee approval and changing market conditions among other considerations. The project costs as well as structural terms are subject to

change following review of the final project design along with architect's and construction manager's final cost estimate.

(Dkt. No. 137-9 at 13.) The Terms Sheet then provided an estimated project cost of $5,000,000, with the caveat that the final budget would be "determined by [WRMC]'s facility design specifications." (*Id.*) The Terms Sheet also proposed two pairs of variable and fixed rate lease options for the space leases in the MOB. (*Id.* at 13–14.) The monthly cost per square foot of the different space lease options varied depending on whether the leased space would be used for primary care practice, an ambulatory surgery center, or other medical offices. (*Id.*) The Terms Sheet also proposed a sixty-year "fair market value" lease for the ground lease on the property. (*Id.* at 15.)

Although Citadel's proposal sought a response by May 27, 2005, WRMC requested more information about the proposal on June 7, 2005. (*Id.* at 12; Pl.'s 56.1 Facts ¶ 9.) Citadel provided a detailed development budget of $6,200,000 in response to this request on June 15, 2005. (Pl.'s 56.1 Facts ¶ 11.) On July 19, 2005, William Bradley presented Citadel's proposal and another developer's proposal to Washington Regional Medical System's Board of Directors ("the Board"), which governs WRMC. (*Id.* ¶ 13.) Bradley recommended Citadel's proposal over the other developer's and sought authority to make a $60,000 deposit payment to Citadel, which the Board granted him. (*Id.* ¶ 15.)

**B. Authorization to Proceed**

After WRMC's auditors certified that the proposal would qualify for off-balance sheet treatment, Citadel submitted another proposal letter to WRMC on August 24, 2005. (*Id. ¶ 16*; Def.'s 56.1 Facts ¶ 10.) Although the letter began by stating "Citadel Group Limited is pleased to present [WRMC] with [Citadel's] comprehensive development proposal," the letter does not

expressly incorporate any other documents.  (Def.'s 56.1 Facts ¶¶ 10–11.)  Nevertheless, the

August 24 letter was nearly identical to the May 13 letter.  Besides certain dates, the only

substantive difference in the August 24 letter was the addition of a sentence in the appended

"Authorization to Proceed."  (*Id.* ¶ 12.)  The text of the Authorization to Proceed was as follows,

with emphasis added to the sentence not previously included:

> Washington Regional Medical Center authorizes Citadel Group Limited to proceed with Project development at a fee of four percent (4%) of project costs according to the following schedule: (I) a 1% good faith deposit upon execution of this proposal, and (ii) the balance from Project funding.  Washington Regional Medical Center is responsible for all legal expenses and other costs associated with Project development, except architectural and engineering fees, whether or not the project is ultimately developed.  Project costs and expenses may be included in the Project's budget and hence, refunded to Washington Regional Medical Center at Project funding.  *Washington Regional Medical Center will only be responsible for architectural and engineering fees in the event Washington Regional Medical Center does not execute its space leases and ground lease.*

(Def.'s 56.1 Facts ¶ 18.)  Bradley signed the Authorization to Proceed on behalf of WRMC on

September 15, 2005, despite the fact that Citadel had sought a response by August 31, 2005.

(Dkt. No. 137–9 at 12.)

Although they concede they had an agreement as of September 15, 2005, the parties

dispute the scope of that agreement.  (Def.'s 56.1 Facts ¶ 16.)  Citadel contends that WRMC was

accepting Citadel's "comprehensive development proposal" by signing the Authorization to

Proceed.  (Pl.'s 56.1 Facts ¶ 18.)  In particular, Citadel claims that WRMC knew it was accepting

the Terms Sheet from the May 13 proposal, because WRMC relied upon Citadel's proposed

lease terms in comparing Citadel's proposal to the competing developer's.  (*Id.* ¶¶ 13, 17–18.)

As such, Citadel believes it is entitled to damages for the profits it would have received had it

implemented all the elements of the comprehensive development proposal.  (*Id.* ¶ 39.)

According to Citadel, these lost profits include the rental income from the space leases discussed in the Terms Sheet, the residual value of the MOB, and other fees that would have been incurred upon the deal's closing. (Def.'s 56.1 Facts ¶ 73.)

On the other hand, WRMC alleges that "[n]either ground nor space leases had been drafted, much less executed, at the time WRMC signed the Authorization." (*Id.* ¶ 26.) In support of this contention, WRMC points to the fact that the language of the Authorization to Proceed anticipates that the execution of the ground and space leases might never occur. (*Id.* ¶ 15.) Indeed, WRMC argues that ground and space leases were never executed, and thus Citadel cannot seek lost profits based on them. (Mem. at 12–15.)

### C. Lease Negotiations

Whatever the scope of their agreement on September 15, 2005, the parties continued working with one another to develop plans for the MOB in the months after executing the Authorization to Proceed. During this time, Citadel hired attorneys, architects, engineers, and worked to arrange financing. (*Id.* ¶ 39.) The parties also continued to negotiate regarding the lease terms. (*Id.* ¶ 41; Pl.'s 56.1 Facts ¶ 25.)

On March 21, 2006, Citadel's Adam Lynch sent WRMC's Tami Hutchison an email attaching "a preliminary calculation for [the MOB's] lease rates." (Def.'s 56.1 Facts ¶ 41.) The attached document compares what it describes as the "Original Terms Sheet" from May 9, 2005, with "Preliminary Lease Rates" dated March 21, 2006. (Lynch Dep., Ex. 36 at 2.) The new "Preliminary Lease Rates" are different and higher. (*Id.*) There is also a formula explaining how the new lease rates were calculated as the product of "cost per s[quare] f[oot] / org cost per s[quare] f[oot] x org avg lease rate." (*Id.*)

Upon receiving the March 21 email, Hutchison responded to Lynch the same day saying, "Wow, this is a big difference. We need to discuss." (Def.'s 56.1 Facts ¶ 42.) Later, on April 26, 2006, Hutchison again wrote to Lynch regarding the proposed lease rates:

> [W]e [WRMC] have to have a lease rate that is fair market value, or we aren't going to be able to give you the support you'll need in order to close by May 15th. We'll need to be assured that the $30/s[quare] f[oot] that is illustrated in the draft lease can be reduced by about 25% in order for this to get back into a comfort zone for us.

(*Id.* ¶ 43.) Although WRMC states otherwise, Citadel contends that Hutchison knew that a fair market value lease rate was not required by the parties' agreement but was merely financially better for WRMC. (Pl.'s 56.1 Facts ¶ 26.) Citadel also points to the undisputed facts that a fair market value lease rate for a standard MOB would be between $22 and $25 per square foot and that the lease rate quoted in Citadel's March 21 correspondence for the primary care space was $23.44. (*Id.* ¶ 27.)

### D. Termination of WRMC's and Citadel's Relationship

On May 4, 2006, Hutchison informed Lynch that WRMC was considering the cost of terminating its relationship with Citadel. (Pl.'s 56.1 Facts ¶ 29.) The following day Hutchison sent Citadel CEO David Varwig a letter stating:

> As we discussed yesterday afternoon, Washington Regional Medical Center will be presenting the financial terms of the proposed [MOB] project to its Board of Directors Tuesday, May 16, 2006. To present an accurate and complete presentation it is necessary that Citadel provide detailed documentation itemizing the cost of the Project no later than May 10, 2006. Obviously, there is concern on our end that the preliminary costs that Citadel has presented reflect a total project cost that is not competitive with the market. As the Board may determine not to proceed with the Project based on current cost projections we would direct Citadel not to incur any further costs beyond that necessary to provide the cost projections by Wednesday.

(Def.'s 56.1 Facts ¶ 45.) Varwig responded to Hutchison's letter on May 8, 2006 with a "current estimate of costs incurred to date" totaling $722,216. (*Id.* ¶¶ 48–49.) Varwig also added: "If

you want to cancel the project, let me know as soon as possible and we will then direct everyone to stop work and send precise invoices."[4]  (*Id.* ¶ 48.)

On May 10, 2006, Lynch sent Hutchison the requested project budget.  (*Id.* ¶ 54.)  The budget actually presented two options based on different tenant improvement allowances.  (*Id.*; Pl.'s 56.1 Facts ¶ 30.)  The first option showed a total budget of $7,117,389, a lease rate of $19.70 per square foot, and a $40 per square foot tenant improvement allowance.  (Pl.'s 56.1 Facts ¶ 30; Lynch Dep., Ex. 74 at 2.)  The second option showed a total budget of $8,547,472, a lease rate of $23.66 per square foot, and a tenant improvement allowance of $74.85.  (Pl.'s 56.1 Facts ¶ 30; Lynch Dep., Ex. 74 at 2.)

At the May 16, 2006 meeting of WRMC's Board of Directors, Hutchison and WRMC's Chief Financial Officer, Dan Eckels, made a presentation comparing the second option outlined in Citadel's May 10 budget to the cost of developing the MOB without an outside developer.  (Pl.'s 56.1 Facts ¶¶ 32–33.)  Based on a comparison of Citadel's quoted lease rate of $23.66 per square foot and an "[i]nhouse" lease rate of $22.29 per square foot, that presentation identifies a "[r]ental premium w/developer" of $1.37 per square foot yielding a $2,466,000 difference in rent.  (*Id.* ¶ 33.)  According to Citadel's characterization, which WRMC disputes, the Board was therefore considering "the financial benefits of internalizing Citadel's profit."  (*Id.* ¶ 34.)  For its part, WRMC acknowledges that "separation costs" were discussed at the meeting but denies that these costs were understood to include the $4.5 million Citadel alleges in lost profits.  (Def.'s 56.1 Facts ¶¶ 57–60.)  Regardless, WRMC's Board voted to discontinue the use of an outside

---

[4]  The parties dispute whether Citadel honored WRMC's request to stop incurring costs. Because these facts pertain primarily to other pending claims not at issue in the current motion, we do not address them.

developer for the MOB at the May 16 meeting.  (*Id.* ¶ 56.)  WRMC informed Citadel that it was terminating their relationship the following day.  (*Id.* ¶ 61.)

### E.  Current Litigation

Following the termination of their agreement, Citadel sent WRMC a letter on May 30, 2006 seeking $587,841.94 "to reimburse [Citadel] for [its] progress payments and cover [its] outstanding balances with various parties."  (*Id.* ¶ 64.)  The letter enclosed "supporting documentation and invoices for Citadel Group's expenses incurred on the project."  (*Id.*) WRMC contended that, by the terms of the Authorization to Proceed, it was only obligated to pay architectural and engineering fees.  (*Id.* ¶ 65.)  WRMC also refused to pay these expenses unless it received "deliverables" from Citadel, specifically the architectural, engineering, and construction plans for the MOB.  (Pl.'s 56.1 Facts ¶ 35.)  Citadel maintained that this work product was in fact its "development work product."  (*Id.*)  Ultimately, WRMC never made any payment to Citadel other than the original $60,000 deposit tendered along with the Authorization to Proceed.  (*Id.* ¶ 37.)

Citadel filed its initial complaint in this action on January 31, 2007 in the Circuit Court of Cook County, Illinois.  (Def.'s 56.1 Facts ¶ 71.)  The initial complaint sought $587,841.94 in damages for breach of the Authorization to Proceed.  (*Id.*)  WRMC removed the case to this Court, and litigation continued on this single claim for two years.  (*Id.* ¶ 72.)

Meanwhile, in May and July of 2007, WRMC signed agreements to continue using the same architect, AMB Development Group, LLC ("AMB"), and engineer, USI Consulting Engineers, Inc. ("USI"), that Citadel had hired.  (*Id.* ¶ 69.)  WRMC paid the architect and engineer sums of $207,646.40 and $29,923.06, respectively, which they had theretofore been

seeking from Citadel. (Def.'s 56.1 Facts, Ex. 8 ¶¶ 9–11; Def.'s 56.1 Facts, Ex. 9 ¶¶ 8–10.)

WRMC paid these sums in exchange for the release of the architect's and engineer's claims

against Citadel. (Def.'s 56.1 Facts, Ex. 8 ¶ 9; Def.'s 56.1 Facts, Ex. 9 ¶ 8.) WRMC has since

built the MOB, which the Washington Regional Foundation owns. (Bradley Dep. at 23, 43.)

On February 18, 2009, apparently after learning of the MOB's construction, Citadel filed

an amended complaint. (Dkt. No. 63 at 4.) The amended complaint contained the original count

plus three additional counts. (*Id*. at 1–7.) Count II, on which WRMC now seeks partial

summary judgment, alleges that WRMC's "actions in using Citadel's AMB and USI plans and

the work product which they had prepared for Citadel to build the [MOB] are a breach of its

agreement with Citadel." (*Id*. at 4.) Citadel further alleges that it has been damaged by "breach

of the parties' agreement because it has lost the benefit of the bargain it would have otherwise

enjoyed if it had been able to complete the project and lease it to [WRMC], as called for in the

parties' agreement." (*Id.*)

## II. STANDARD

Summary judgment is proper only when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A genuine

issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505,

2510 (1986). This standard places the initial burden on the moving party to identify those

portions of the record that "it believes demonstrate the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). Once the

moving party meets this burden of production, the nonmoving party "must go beyond the

pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56©. In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

## III. ANALYSIS

WRMC moves for partial summary judgment on Count II on the grounds that Citadel's claim for lost profits stems from ground and space leases that were not part of the Authorization to Proceed and were not ultimately executed.[5] (Mem. at 10–15.) Citadel responds that WRMC's signing of the Authorization to Proceed was an acceptance of a "comprehensive development proposal," which contemplated rental income and other profits for Citadel based on a "set" but "flexible" formula. (Resp. at 1, 10.)

---

[5] WRMC also argues that Citadel waived its right to claim damages for lost profits by failing to inform WRMC of these claims when WRMC was contemplating terminating their relationship. (Mem. at 7–10.) Because we believe WRMC is entitled to summary judgment on the merits of its argument about the scope of the parties' agreement, we need not decide whether Citadel waived its right to seek lost profits.

### A.  Governing Law

Because the parties acknowledge they had an agreement, this case presents a question of contract interpretation.  In Illinois,[6] the "general rule" is that "the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law." *Avery v. State Farm Mut. Auto Ins. Co.*, 216 Ill.2d 100, 129, 835 N.E.2d 801, 821 (Ill. 2005).  The goal of contract interpretation is to discern and give effect to the parties' intent. *Doornbos Heating and Air Conditioning, Inc. v.  Schlenker*, 403 Ill.App.3d 468, 488, 932 N.E.2d 1073, 1092 (1st Dist. 2010).  As the Seventh Circuit has noted, however, the use of the term "intent" is misleading in so far as it implies a subjective inquiry into the parties' state of mind at the time of contracting. *See Empro Mfg. Co., Inc. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989) (discussing the meaning of "intent" in Illinois contract law).  Instead, in the case of a written contract, a court evaluates the parties' intent based on the outward expression of their intent in the form of the written contract. *Id.*; *see also Interway, Inc. v. Alagna*, 85 Ill.App.3d 1094, 1098, 407 N.E.2d 615, 619 (1st Dist. 1980).  A contract is also to be "construed as a whole, viewing each part in light of the others." *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (citing Illinois law).

If the written contract is unambiguous, a court must "construe the parties' intent from the writing itself as a matter of law and effectuate its plain and ordinary meaning." *Doornbos Heating*, 403 Ill.App.3d at 488, 932 N.E.2d at 1092; *Interway*, 85 Ill.App.3d at 1098, 407 N.E.2d

---

[6]  Both parties assume without argument that Illinois law governs Citadel's contract claim in Count II.  The issue may not be as simple as their silence suggests, but we accept that Illinois contract law governs Citadel's claim in Count II.  "The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits." *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) (cited in *Massachusetts Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir. 1998).

at 619. Whether a contract is ambiguous is a question of law. *Interway*, 85 Ill.App.3d at 1098, 407 N.E.2d at 619; *Curia*, 587 F.3d at 829. A contract is ambiguous when "the language employed is susceptible to more than one reasonable meaning or obscure in meaning through indefiniteness of expression." *Platt v. Gateway Intern. Motorsports Corp.*, 351 Ill.App.3d 326, 330, 813 N.E.2d 279, 283 (5th Dist. 2004); *Curia*, 587 F.3d at 829.

In Illinois, a lease is a particular kind of contract with specific elements required to be enforceable. In order to be enforceable, the purported lease agreement must specify: "(1) the extent and bounds of the property; (2) the term of the lease; (3) the amount of rent; and (4) the time and manner of payment." *Millenium Park Joint Venture, LLC v. Houlihan*, --- N.E.2d ----, Case No. 108923, 2010 WL 5187762, at *14 (Ill. Dec. 23, 2010); *see also Feeley v. Michigan Ave. Nat'l Bank*, 141 Ill.App.3d 187, 191, 490 N.E.2d 15, 18 (1st Dist. 1986). Absent any of these elements, there is no enforceable lease. *Millenium Park Joint Venture*, 2010 WL 5187762, at *14. But even if a document contains all the essential elements of a lease, the document is not a lease if the parties do not intend it to be one. *Feeley*, 141 Ill.App.3d at 192, 490 N.E.2d at 18. In determining whether the parties intended for a document to be a lease, a court looks to "the language of the agreement, the circumstances surrounding the negotiation of the agreement, custom in the industry or trade, and the conduct of the parties before and after the agreement." *Id.* (citations omitted).

In this case, the lease-back plan WRMC initially pursued envisioned multiple leases and related agreements. Given this complexity, we are mindful of the Seventh Circuit's admonition that "Illinois is averse to enforcing tentative agreements that are expressly contingent on the signing of formal or final documents." *PFT Roberson, Inc. v. Volvo Trucks North America, Inc.*,

420 F.3d 728, 731 (7th Cir. 2005); *see also Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217 (7th Cir. 1988).  Put another way, parties may "reach[] agreement in stages without taking the risk that courts will enforce a partial bargain that one side or the other would have rejected as incomplete."  *PFT Roberson*, 420 F.3d at 731.  Furthermore, as they progress through these stages, the parties are free to "decide for themselves whether the results of preliminary negotiations bind them[.]"  *Empro Mfg.*, 870 F.2d at 425.  And as with other contracts, "they do this through their words."  *Id.*  There are no "magic words," however, that establish that a preliminary agreement is subject to a later, definitive agreement.  *PFT Roberson*, 420 F.3d at 732.  Instead, "words expressing contingency or dependence on a subsequent event or agreed-on element will do."  *Id.*

### B.  Citadel's Claim for Lost Profits

The material facts pertinent to Count II are undisputed.  Citadel concedes that "many of the facts" upon which WRMC relies for its motion are true.  (Resp. at 2.)  Citadel argues, however, that the facts WRMC presents are only part of the story.  (*Id.*)  But even with Citadel's additional facts in view, there is no genuine issue of material fact as to whether the alleged breach of the parties' agreement can give rise to Citadel's damages for lost profits.  Fed. R. Civ. P. 56(a).  It can not.  Therefore, WRMC is entitled to summary judgment on Count II.  *Id.*

Before analyzing particular portions of the parties' agreement, it is important to have a broad view of the context in which their agreement arose.  As is undisputed, WRMC initially sought to develop a MOB in Springdale, Arkansas through a lease-back arrangement with an outside developer.  (Def.'s 56.1 Facts ¶¶ 4–5.)  Under this arrangement, WRMC would grant a long-term lease to a developer, who would then build the MOB, retain ownership of it, and lease

it back to WRMC. (*Id.* ¶ 5.) Had WRMC pursued the lease-back plan to fruition, the plan would have had two contracting phases: first, the selection of an outside developer; and second, the closing of the deal with the developer, including, among other things, the execution of ground and space leases. As it happened, WRMC only pursued the lease-back plan through the first phase. After hiring Citadel and working with it for several months, WRMC ultimately chose not to use an outside developer at all. (Pl.'s 56.1 Facts ¶¶ 32–33.) Nevertheless, Citadel attempts to construe the agreement executed during the first phase of contracting—the only agreement ever executed between WRMC and Citadel—as giving rise to damages that could only flow from an agreement reached in the second phase of contracting. The unambiguous language of the agreement the parties did reach, considered in light of the parties' continuing negotiation after that agreement, dictates this conclusion.

### 1. Damages Related to the Alleged Leases

As an initial matter, the parties dispute what documents and portions thereof ought to be considered as their agreement. WRMC contends that the agreement consists solely of the one-paragraph Authorization to Proceed contained in Citadel's August 24, 2005 letter and executed by WRMC on September 15, 2007. (Def.'s 56.1 Facts ¶¶ 10–18.) Citadel maintains that WRMC agreed to a "comprehensive development proposal" that includes, in particular, the Terms Sheet accompanying Citadel's letter of May 13, 2007. (Def.'s 56.1 Facts ¶¶ 8, 17.) And while Citadel's August 24 letter does not explicitly incorporate the Terms Sheet, the letter does refer to a "comprehensive development proposal." (Dkt. No. 137-9 at 1.) As such, Citadel, as the non-moving party, is entitled to the inference that the agreement encompassed both the Authorization to Proceed and the Terms Sheet. *Anderson*, 477 U.S. at 255.

In any event, this dispute is immaterial. Even if we view the contract as encompassing both the Authorization to Proceed and the Terms Sheet, the language in those documents unambiguously indicates that Citadel and WRMC had not reached agreement on the ground and space leases essential to Citadel's claim for damages in Count II. According to its own title, the Terms Sheet was in fact a "*Preliminary* Leasing Terms Sheet." (Dkt. No. 137-9 at 13 (emphasis added).) Furthermore, the document begins with a broadly-worded disclaimer providing that:

> The following terms reflect interest rates as of May 9, 2005. This terms sheet is *subject to* credit review, commitments committee approval and changing market conditions *among other considerations*. The project costs as well as structural terms are *subject to change* following review of the final project design along with architect's and construction manager's final cost estimate.[7]

(*Id.* (emphasis added)) Words and phrases like "preliminary" and "subject to change" are not ambiguous, and we can interpret them as a matter of law. *Interway*, 85 Ill.App.3d at 1098, 407 N.E.2d at 619. Under their plain and ordinary meaning, these words and phrases convey a lack of finality. *Id.* Thus, the Terms Sheet was clear on one essential point: the terms contained therein were not final.

The lack of finality apparent from the face of the Terms Sheet means that, even if the Terms Sheet is part of the parties' contract, their contract does not include ground and space leases. As the court in *Feeley* made clear, "the final determination in ascertaining whether an

---

[7] Citadel argues that this disclaimer is "the equivalent of a *force majeure* clause referring to events beyond the parties' control," specifically, decisions by the third-party bank Citadel would use to help finance the project. (Pl.'s 56.1 Resp. ¶ 6.) We find this contention to be unfounded in light of the clause's placement at the beginning of a document described as "preliminary" on every page. (Dkt. No. 137-9, at 13–15.) In any event, it is undisputed that Citadel drafted the disclaimer, and it is well-established that a contract is to be construed strictly against the drafter. *Covinsky v. Hannah Marine Corp.*, 388 Ill.App.3d 478, 484, 903 N.E.2d 422, 427 (1st Dist. 2009). If Citadel intended this broad disclaimer to have the narrow application it now posits, it should have so set forth in the document itself.

instrument is a lease is what was intended by the parties." 141 Ill.App.3d at 192, 490 N.E.2d at 18. The unambiguously preliminary nature of the lease terms outlined in the Terms Sheet demonstrates that neither Citadel in drafting the document, nor WRMC in accepting it, was agreeing to definite lease terms.

Further equivocation with respect to specific terms makes this intent clear. With respect to the space leases, WRMC was to "choose between" fixed and variable lease rate options for both the primary care space and the ambulatory surgery center. (Dkt. No. 137-9 at 13–14.) Thus, the Terms Sheet did not even purport to establish a "definite and agreed price of rental" for the space leases, as is required to have an enforceable lease. *Feeley*, 141 Ill.App.3d at 191, 490 N.E.2d at 18. Similarly, the Terms Sheet's proposal for a sixty-year ground lease is followed by a parenthetical stating that "the Project Owner [Citadel] is flexible on the Lease Term." (Dkt. No. 137-9, at 15.) Absent a fixed lease term, the Terms Sheet is also not an enforceable ground lease. *Feeley*, 141 Ill.App.3d at 191, 490 N.E.2d at 18. Thus, even the specific terms in the Terms Sheet demonstrate that the parties did not agree to enforceable ground and space leases.

This conclusion also accords with the document the parties both agree is part of their agreement, the Authorization to Proceed. Immediately prior to the date and signature block, the Authorization to Proceed concludes: "Washington Regional Medical Center will only be responsible for architectural and engineering fees *in the event Washington Regional Medical Center does not execute its space leases and ground lease*." (Dkt. No. 137-9 at 72 (emphasis added).) The contingent phrasing of this sentence leaves little doubt that the leases had not been and were not being executed as of the signing of the Authorization to Proceed. *PFT Roberson*, 420 F.3d at 732 ("[T]he parties need not recite a formula to demonstrate that a definitive

agreement lies in the future. Words expressing contingency or dependence on a subsequent event or agreed-on element will do."). Instead, the execution of or failure to execute the leases was to occur in the future. Thus, the Authorization to Proceed unambiguously demonstrates that the parties were not executing ground and space leases by signing that document.

The parties' behavior after the signing of the Authorization to Proceed further confirms the scope of their agreement. *See Feeley*, 141 Ill.App.3d at 192, 490 N.E.2d at 18 (holding that "the conduct of the parties before and after the agreement" is relevant to determining whether the parties intended an instrument to be a lease). It is undisputed that the parties continued to negotiate regarding the terms of the ground and space leases after the signing of the Authorization to Proceed but prior to WRMC's termination of Citadel as developer.[8] (Pl.'s 56.1 Facts ¶ 41.) In fact, Citadel's David Lynch emailed WRMC's Tami Hutchison on March 21, 2006—six months after the execution of the Authorization to Proceed—with a "preliminary calculation for Har-Ber Meadows [the MOB] lease rates." (Lynch Dep., Ex. 36 at 1.) Attached to the email was a document comparing the lease rates from the "Original Terms Sheet" dated May 9, 2005, with "Preliminary Lease Rates" dated March 21, 2006. (Lynch Dep., Ex. 36 at 2.) The numbers from the "Original Terms Sheet" are the same as those that appear on the Terms Sheet discussed above. (*Id.*; Dkt. No. 137-9 at 13–15.) The new "Preliminary Lease Rates" are different and higher. (Lynch Dep., Ex. 36 at 2.)

---

[8] Citadel purports to deny certain aspects of the continued negotiations between the parties regarding the ground and space leases. (*See* Pl.'s 56.1 Resp. ¶¶ 42–44.) But as WRMC correctly points out in its motion to deem its local rule 56.1 facts admitted, many of Citadel's denials are not in fact denials but statements of additional facts that do not controvert WRMC's assertions of fact. (Dkt. No. 141, at 6.) We deem such improper denials to be admissions. *Smith*, 321 F.3d at 683.

-18-

Although Citadel argues that WRMC should not have been surprised at the increase, the record is clear that the change in lease rates concerned WRMC.  (Def.'s 56.1 Facts ¶ 42; Pl.'s 56.1 Resp. ¶ 42.)  In response to Lynch's email, Hutchison responded, "Wow, this is a big difference.  We need to discuss."  (Def.'s 56.1 Facts ¶ 42.)  Later, on April 26, 2006, Hutchison again emailed Lynch saying, "we have to have a lease rate that is fair market value, or we aren't going to be able to give you the support you'll need in order to close by May 15th."  (*Id.* ¶ 43.)  Citadel claims it had already provided a fair market value lease rate and that it did so again in the final budget it submitted to WRMC.  (Pl.'s 56.1 Facts ¶¶ 27, 30–31.)  But regardless of whether Citadel had provided figures that *should* have met WRMC's demands, as Citadel contends, WRMC terminated Citadel a few weeks later without executing any documents containing such figures.  (Pl.'s 56.1 Facts ¶¶ 56–57.)  Thus, "the conduct of the parties . . . after the agreement" demonstrates that the parties intended for the Authorization to Proceed and the Terms Sheet to be a starting point rather than an end point for lease negotiations.  *Feeley*, 141 Ill.App.3d at 192, 490 N.E.2d at 18.

Citadel nevertheless argues that "all of the key terms to the development and leases were set" when WRMC signed the Authorization to Proceed on September 15, 2005.  (Resp. at 10.)  In particular, Citadel relies on the fact that the Terms Sheet "outlined very specific leasing terms which show a lease rate as a function of the final cost of the building pursuant to a simple formula."  (*Id.* at 14 (citation omitted).)  Thus, according to Citadel, "the specific financial (or deal) terms of the lease were a part of the proposal letter accepted by WRMC."  (*Id.*)

But whatever formulaic relationship might have existed between the terms on the Terms Sheet, this relationship is certainly not apparent from the face of the document.  Indeed, the

formula Citadel presents in its Response—"Total project cost x 0.0884 [the capital rate] ÷ 30,000 [square feet] = Average rent per [square foot]"—does not appear on the Terms Sheet.  (*Id.* at 4; Dkt. No. 137-9, at 13–15.)  If this formula was as fixed and fundamental as Citadel now claims it is, its absence from the Terms Sheet—a document Citadel drafted—is glaring.  *Nebel, Inc. v. Mid-City Nat. Bank of Chicago*, 329 Ill.App.3d 957, 968, 769 N.E.2d 45, 53 (1st Dist. 2002) ("[C]ontractual agreements are construed against the drafter.").  And while Citadel, as the non-movant, is entitled to all reasonable inferences based on the facts in the record, it is not entitled to superimpose a formula on a document where no such formula appears.  *See PFT Roberson*, 420 F.3d at 730 (declining to enforce preliminary agreement where party seeking enforcement relied on formula for contract price that did not appear in document purporting to be contract).

Regardless of whether the Terms Sheet contained the formula, Citadel claims that WRMC knew that the lease rates were a function of the total project cost.  (Resp. at 13–14.)  But this fact, if true, is immaterial.  Even if WRMC knew that Citadel based its lease rates on the total project cost, WRMC was not committing to pay any total project cost, however high, in the form of correspondingly high lease rates.  Indeed, the total project cost—the key variable in Citadel's formula—was described as "estimated" on the Terms Sheet.  (Dkt. No. 137-9 at 13.) Furthermore, the last line of the disclaimer on the Terms Sheet is also particularly relevant: "The project costs as well as structural terms are subject to change following review of the final project design along with architect's and construction manager's final cost estimate."  (*Id.*)  It would contravene the expressly preliminary nature of the Terms Sheet to say that WRMC was

assenting to whatever output the formula generated when the key input, total project cost, was so obviously in flux.[9]

Citadel also claims that WRMC relied on the proposed lease rates in selecting Citadel over a competing developer and later in choosing to terminate Citadel. (Resp. at 13–14.) These facts are also immaterial. Given the nature of the lease-back plan WRMC originally pursued, it is hardly surprising that WRMC would compare the different lease rates proposed by competing developers. But the fact that WRMC hired Citadel over its competitors based on its proposed lease rates does not mean that WRMC was committing to implement what was then only a broadly-defined lease-back plan. As discussed, the Authorization to Proceed unambiguously indicates that the core components of the lease-back plan, the ground and space leases, had not been and might never be executed. (Dkt. No. 137-9 at 72.) Similarly, WRMC's later

---

[9] The indeterminacy of Citadel's formula also distinguishes this case from the case law upon which Citadel relies. In *Sonnenblick-Goldman Corp. v. Murphy*, the Seventh Circuit determined that a clause in a construction loan agreement requiring a "reasonable reserve for contingencies" was not so indefinite as to render the contract unenforceable. 420 F.2d 1169, 1172–73 (7th Cir. 1970). The Court viewed the term "reasonable reserve" as creating an objective standard that prevented the lender from requiring "an arbitrary amount of reserves." *Id.* at 1173. Thus, the calculation in *Sonnenblick-Goldman* was a basic comparison between the reserve amount the lender wanted and, in all likelihood, an objective industry standard for such reserves.

Similarly, in *Dawson v. General Motors Corp.*, the Seventh Circuit considered whether correspondence between General Motors ("GM") and one of its dealers regarding renewal of the dealer's sub-lease with GM was sufficient to form the basis of a contract claim. 977 F.2d 369, 373 (7th Cir. 1992). Based on the parties' extensive prior dealings as sub-lessor and sub-lessee, the Court found that GM's assurance that the dealer's sub-lease would be renewed at a rental rate that would not increase more than three percent over any five-year term was sufficiently definite to survive a motion to dismiss. *Id.* at 374. In *Dawson*, the calculation was as simple as adding three percent to the initial lease rate at the beginning of a five-year term.

By contrast, Citadel's formula contains numerous contingencies dependent on the subjective "wish, will, and desire" of numerous parties. *Sonnenblick-Goldman*, 420 F.2d at 1173. These include, at a minimum, the yet-to-be determined project cost, capital rate, and building size. As such, Citadel's formula is not the fixed lodestar Citadel would like it to be.

comparison of Citadel's proposed lease rates with those WRMC could secure by developing the MOB "inhouse" is also of no moment.  (Pl.'s 56.1 Facts ¶ 33; Mem. at 14.)  WRMC was free to evaluate whether the lease-back plan with Citadel was worth the cost, because again, the key components of that plan—the ground and space leases—had not been executed.

Citadel also points to our holding at the motion to dismiss stage that a reasonable inference could be drawn that the Authorization to Proceed may have "restricted WRMC from proceeding with the Project without Citadel."  (Dkt. No. 77 at 16.)  But the standard at the summary judgment stage is different.  *See* Fed. R. Civ. P.  56(e) (noting that "if a party fails to properly support an assertion of fact" the court may grant summary judgment).  We are no longer required to accept as true Citadel's assertion that WRMC's completion of the MOB using the same architects and engineers breached the agreement.  (Dkt. No. 63 at 4.)  The only relevant text in the agreement provides that WRMC's failure to execute ground and space leases obligates it to pay any architectural and engineering fees.  (Dkt. No. 137-9 at 72.)  The agreement is silent as to whether WRMC's use of the same architects and engineers to complete the MOB would be a breach.  As the Seventh Circuit has said, summary judgment is the "put up or shut up" moment in a case.  *AA Sales & Assoc., Inc. v. Coni-Seal, Inc.*, 550 F.3d 605, 612 (7th Cir. 2008).  Thus, Citadel's silence on this point is fatal.

Viewing the contract as a whole, as we must, what we are able to discern is that the parties' agreement was a preliminary one that contemplated future agreements.  *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1038 (7th Cir. 1998) ("Illinois law requires that we . . . examine [the contract] as a whole, giving effect, to the extent possible, to all contractual provisions.") (citing Illinois law); *see also PFT Roberson*, 420 F.3d at 732 ("[T]he parties need

not recite a formula to demonstrate that a definitive agreement lies in the future. Words expressing contingency or dependence on a subsequent event or agreed-on element will do.") (interpreting Illinois law). Admittedly, this preliminary agreement contained certain binding provisions regarding the parties' obligation to pay certain costs, as preliminary agreements are wont to do. *Empro Mfg.*, 870 F.2d at 425 ("Parties may decide for themselves whether the results of preliminary negotiations bind them[.]"). But any agreement the parties had with respect to the ground and space leases was obviously "contingent on the signing of formal or final" leases. *PFT Roberson*, 420 F.3d at 731. And as the Seventh Circuit has held, "Illinois is averse to enforcing tentative agreements that are expressly contingent on the signing of formal or final documents." *Id.* Thus, Citadel cannot recover damages for lost profits flowing from space leases that were never executed. (Amend. Compl. ¶ 13.) Similarly, Citadel cannot recover damages for the residual value of the MOB, which Citadel had no right to build without an executed ground lease. (Def.'s 56.1 Facts ¶ 73.)

### 2. Damages Related to Certain Fees

Lastly, Citadel also claims damages pursuant to a 4% development fee referenced in the Authorization to Proceed and a 2.5% construction and permanent lending fee referenced in the August 24 letter accompanying the Authorization to Proceed. (*Id.*; Dkt. No. 137-9 at 71–72.) Citadel's claim to these fees is plagued by the same faulty assumption that doomed its claim to income from the leases. (Def.'s 56.1 Facts ¶ 78–79.) Because WRMC chose not to close the lease-back deal with Citadel—as WRMC was entitled to do—Citadel was never entitled to these fees and cannot recover them now.

The Authorization to Proceed made the outstanding portion of the 4% development fee contingent on "Project funding," which was to occur, if at all, at the closing of the lease-back deal.  As the Authorization to Proceed provides:

> Washington Regional Medical Center authorizes Citadel Group Limited to proceed with Project development at a fee of four percent (4%) of project costs according to the following schedule: (I) a 1% good faith deposit upon execution of this proposal, and (ii) the balance from Project funding.

(Dkt. No. 137-9 at 72.)  This payment "schedule" contemplates two relevant occurrences: first, "execution of this proposal"; and second, "Project funding."  (*Id.*)  It is undisputed that WRMC made the deposit payment based on the projected budget at the time the Authorization to Proceed was executed.[10]  (Pl.'s 56.1 Facts ¶ 15.)  But "Project funding" as contemplated in the agreement

---

[10]  In its answer to Citadel's initial complaint, WRMC asserted a counterclaim for a set off of the $60,000 "good faith deposit" against any damages it might owe Citadel.  (Dkt. No. 56 at 13.)  Neither party has moved for summary judgment on that counterclaim, and so we reach no conclusion as to WRMC's right to set off the amount of the deposit against any damages it might owe Citadel.  Similarly, the issue of the deposit is not before us under Citadel's claim for lost profits under Count II.  Since it is undisputed that Citadel received the deposit, Citadel would not be entitled to recover damages for the deposit.  (Pl.'s 56.1 Facts ¶ 15.)  The purpose of damages in contract law is to "place the nonbreaching party in the position he would have been in had the contract been performed, but not to place him in a better position or provide him with a windfall recovery."  *Platinum Tech., Inc. v. Federal Ins. Co.*, 282 F.2d 927, 932 (7th Cir. 2002).

But in light of this bedrock principle of contract law, the figure Citadel provides for the development fee is rather curious.  Citadel seeks $351, 977, which is 4% of $8,799,421.  (Def.'s 56.1 Facts ¶ 73; Dkt. No. 125-11 at 14.)  Citadel apparently declined to deduct the $60,000 deposit from the $351,977 and is thus seeking recovery for damages it admittedly never sustained.  (Pl.'s 56.1 Facts ¶ 15.)  Furthermore, according to Citadel's response to WRMC's interrogatories, the $8,799,421 figure is from the "Last Project budget" dated May 10, 2006.  (Dkt. No. 125-11, at 14.)  And yet, the "Last Project budget" Citadel submitted to WRMC on May 10, 2006 was in fact two budget options, neither of which specifies a project cost of $8,799,421.  (Pl.'s 56.1 Facts ¶ 30; Dkt. No. 137-9 at 29–30.)  Admittedly, one of these options includes a total project cost of $8,547,472, but Citadel's failure to offer any explanation as to why these figures are different is troubling.  (*Id.*)

never occurred.[11]  And yet, despite the Authorization to Proceed's recognition that WRMC might not execute the ground and space leases and thus preclude project funding, Citadel failed to include any provision regarding the outstanding portion of its fee in the event of such a contingency.  (Dkt. No. 137-9 at 72.)  Prior to the execution of the Authorization to Proceed, WRMC and Citadel also never discussed whether Citadel would receive its full fee in the event WRMC terminated their relationship.  (Def.'s 56.1 Facts ¶ 22.)  Thus, there is no evidence in the record that WRMC agreed to pay the outstanding portion of Citadel's fee in the event WRMC terminated their relationship prior to project funding.  *See* Fed. R. Civ. P.  56(e) (noting that "if a party fails to properly support an assertion of fact" the court may grant summary judgment).

Citadel is also not entitled to the 2.5% construction and permanent lending fee.  Citadel's August 24 letter accompanying the Authorization to Proceed describes the lending fee as follows:

> The Project loan is anticipated to be at an interest rate of 4.8% based on current market conditions, with a 2.5% combined construction and permanent lending fee paid to the lender.

(Dkt. No. 137 at 71.)  This sentence, like virtually all the documents upon which Citadel relies, unambiguously demonstrates the preliminary nature of the parties' agreement.  The rates quoted were "anticipated" and "based on market conditions."  (*Id.*)  And furthermore, the "Project loan" described was never issued, because the deal never closed.  Thus, WRMC was not agreeing to

---

[11] To the extent the term "Project funding" is ambiguous in light of the MOB's ultimate construction, we understand "Project funding" to mean the project funding Citadel was seeking to arrange in anticipation of the closing of the lease-back deal.  If Citadel intended to guarantee its fee regardless of whether the project funding obtained was that which Citadel was arranging, it should have said so when it drafted the agreement.  *Bourke*, 159 F.3d at 1036 ("[A]ny ambiguity in the terms of a contract must be resolved against the drafter of the disputed provision.").

pay this fee by signing the Authorization to Proceed, and Citadel is also not entitled to it as a matter of law.

## IV. CONCLUSION

Citadel is not entitled to seek "the benefit of the bargain" from a deal that was never consummated. (Dkt. No. 73 at 4.) Accordingly, WRMC's motion for partial summary judgment on Count II is granted. It is so ordered.

Honorable Marvin E. Aspen
U.S. District Court Judge

Date: March 22, 2011