UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CITADEL GROUP LIMITED,<br>a Delaware corporation,<br><br>   Plaintiff/Counter-Defendant<br><br>vs.<br><br>WASHINGTON REGIONAL MEDICAL<br>CENTER, an Arkansas not-for-profit corporation,<br><br>   Defendant/Counter-Plaintiff. | Case No. 07-cv-1394 |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Plaintiff Citadel Group Limited ("Citadel") asks us to reconsider our grant of summary judgment in favor of Defendant Washington Regional Medical Center ("WRMC") on Count II of Citadel's amended complaint. (Mot. at 1–9; Op. 3/22/11 at 26.) Citadel also asks us to reconsider our prior dismissal of Count III of its amended complaint. (Mot. at 10–17; Op. 5/13/09 at 17–20.) Citadel's motion is denied.

**I. BACKGROUND**

We need not rehash all the facts of this case but will instead highlight those relevant to the present motion. This case arises from the fractured relationship between Citadel and WRMC. This relationship developed as WRMC was considering constructing a medical office building in Springdale, Arkansas in 2005. WRMC was originally planning to construct the building through a leaseback arrangement with a third-party developer. According to this

arrangement, WRMC would execute a long-term ground lease with a third-party developer, who would then construct the building and lease it back to WRMC. WRMC sought this type of arrangement in order to construct the building without having to accrue additional debt on its balance sheet. After considering several other third-party developers, WRMC signed an "Authorization to Proceed" with Citadel. Before executing ground or space leases with Citadel, however, WRMC decided to terminate its relationship with Citadel. Although WRMC ultimately constructed the building, it did so without entering a leaseback arrangement with a third-party developer.

Citadel initially sued WRMC for breach of contract based on WRMC's alleged failure to cover certain costs specified in the Authorization to Proceed. After discovering WRMC had built the building without Citadel but with the same architect and engineer Citadel had been using, Citadel subsequently amended its complaint to add Counts II and III, which are at issue here. In Count II, Citadel sought the profits it allegedly lost when WRMC completed the building without it. In Count III, Citadel alleged that WRMC had failed to negotiate in good faith in declining to close the leaseback deal. Citadel now asks us to reconsider our order of March 22, 2011, in which we granted summary judgment in favor of WRMC on Count II of Citadel's amended complaint. Citadel also asks us to reconsider our order of May 13, 2009, in which we dismissed Count III of Citadel's amended complaint for failure to state a claim. We consider Citadel's arguments with respect to these two counts in turn.

## II. ANALYSIS

### A. Count II

In Count II, Citadel sought to recover the profits it allegedly lost when WRMC decided

not to close the leaseback deal. (Am. Compl. at 4–5.) We granted summary judgment for WRMC on Count II because we determined that the Authorization to Proceed—the only agreement reached between WRMC and Citadel—did not include ground and space leases essential to Citadel's Count II damages. (Op. 3/22/11 at 11–26.) Applying the principles of contract interpretation followed in Illinois, we held that the unambiguous language of the Authorization to Proceed demonstrated a lack of present intent to execute any leases. (*Id.* at 18.) In short, we determined that the Authorization to Proceed was a preliminary agreement that, although potentially enforceable in some respects, was not a final agreement to construct the building using a leaseback arrangement. (*Id.* at 22–23.) Citadel now asks us to reconsider that decision. (Mot. at 1–9.)

Although Citadel does not say so, we presume that Citadel brings its motion to reconsider our grant of summary judgment on Count II pursuant to Rule 59(e). *See* Fed. R. Civ. P. 59(e) (providing for motions to "alter or amend a judgment" filed within twenty-eight days of entry of the judgment). To succeed on a Rule 59(e) motion, the moving party must present newly discovered evidence, point out an intervening change in controlling law, or clearly establish that the court committed a manifest error of law or fact. *See Caisse Nationale de Credit Agricole v. CBA Indus., Inc.*, 90 F.3d 1264, 1269–70 (7th Cir. 1996); *Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985). "A 'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (internal citation omitted). Indeed, reconsideration is appropriate in limited circumstances, such as "where (1) the court has patently misunderstood a party; (2) the court has made a decision

outside the adversarial issues presented to the court by the parties; (3) the court has made an error not of reasoning but of apprehension; (4) there has been a controlling or significant change in law . . . or (5) there has been a controlling or significant change in the facts." *BP Amoco Chem. v. Flint Hills Res., LLC*, 489 F. Supp. 2d 853, 856 (N.D. Ill. 2007); *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191–92 (7th Cir. 1990); *see also Hickory Farms, Inc. v. Snackmasters, Inc.*, 509 F. Supp. 2d 716, 719 (N.D. Ill. 2007) ("Reconsideration is appropriate, generally speaking, only when the Court overlooked or misunderstood something."). A motion for reconsideration should not be used for "rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole*, 90 F.3d at 1270.

Citadel attempts to bring its motion within the narrow circumstances warranting reconsideration by arguing that our order "misconstrued the nature of Citadel's 'comprehensive development proposal'" that WRMC allegedly accepted by signing the Authorization to Proceed. (Mot. at 1.) Citadel argues that "[w]hat the court viewed as indefinite terms were, in fact, Citadel's offer to conform the proposal to any changes by WRMC to the building, all within the framework of the fixed formula showing the relationship between costs and rent." (*Id.* at 2.) Moreover, in Citadel's view, "[a]ll of the points cited by the Court are consistent with a build-to-suit program" that WRMC accepted by signing the Authorization to Proceed. (*Id.*)

Despite its insistence otherwise, however, Citadel's motion is largely a "rehashing [of] previously rejected arguments." *Caisse Nationale de Credit Agricole*, 90 F.3d at 1270. Indeed, we considered and rejected Citadel's formula argument in our prior decision. (Op. 3/22/11 at 19–21.) We did so for two primary reasons. First, we determined that the absence of the

formula from any of the documents purportedly comprising the contract precluded the conclusion that the formula was in fact an agreed-upon component of the Authorization to Proceed. (*Id.* at 20 (citing *PFT Roberson, Inc. v. Volvo Trucks North America, Inc.*, 420 F.3d at 730).) Second, and more importantly, we determined that, even if WRMC was aware of the basic formulaic relationship between total project cost and the estimated lease rates, "WRMC was not committing to pay any total project cost, however high, in the form of correspondingly high lease rates." (*Id.*) In distinguishing Citadel's formula theory from other cases in which courts have allowed an agreed-upon formula to supply missing contract terms, we observed that Citadel's formula contained "numerous contingencies" that rendered it something far short of "the fixed lodestar Citadel would like it to be." (*Id.* at n.9.)

Thus, Citadel's argument that we somehow misunderstood the "build-to-suit program" of which the formula was supposedly the linchpin is incorrect. (Mot. at 2.) We did not misunderstand Citadel's argument. We simply rejected it as an attempt to conjure up essential lease terms where no such terms had been agreed upon. Indeed, it does not matter whether WRMC knew about the basic relationship between the total project cost and the lease rates in Citadel's initial proposal. What matters is whether WRMC and Citadel intended the Authorization to Proceed to constitute the ground and space leases that were the core of the leaseback deal. *See Feeley v. Michigan Ave. Nat. Bank*, 141 Ill. App. 3d 187, 192, 490 N.E.2d 15, 18 (1st Dist. 1986) ("The final determination in ascertaining whether an instrument is a lease is what was intended by the parties.") As we have already determined, the unambiguous language of the Authorization to Proceed and the accompanying documents makes it clear that neither WRMC nor Citadel had such intent. (Op. at 16–19.)

We cannot accept that Citadel, a sophisticated business entity, actually understood the Authorization to Proceed and the Preliminary Terms Sheet to encompass enforceable ground and space leases. Regarding the alleged ground lease, would Citadel really have felt entitled to occupy WRMC's property for sixty years—let alone construct a building on it—based on the three bullet points pertaining to the ground lease in the Preliminary Terms Sheet? We think not. Similarly, we do not accept that all WRMC had to do was name the building size and build-out allowance and, shazam, the space leases would materialize according to Citadel's formula.

(Mot. at 8.)

As Citadel CEO David Varwig admitted, the total project cost—the key variable linked to the lease rates—was subject to myriad contingencies outside either party's control. When asked what could cause the total project cost to go up at his deposition, Varwig responded:

> There could be quite a number of things actually. Cost of raw materials. Cost of labor. If interest rates increased dramatically, that could cause construction term interest to increase, which is a component of a budget. The interest you pay out while the building is under construction because you make construction progress payments. There's just a whole host of things.

(Varwig Dep. at 56–57.) In fact, it was likely the existence of all these contingencies that caused Citadel to include the broad disclaimer at the beginning of the Preliminary Terms Sheet in which all the terms were made "subject to credit review, commitments committee approval and changing market conditions among other considerations." (Dkt. No. 125–12 at 34.) And while Citadel quotes the Seventh Circuit for the proposition that even a contract that "bristles with unresolved contingencies" can still be enforceable, Citadel cannot escape the fact that the unambiguous language of the very documents it drafted reflect a lack of present intent to execute

ground and space leases. (Mot. at 7 (quoting *Haslund v. Senior Property Group*, 378 F.3d 653, 655 (7th Cir. 2004).)

Citadel's attempt to undermine the bases upon which we distinguished the case law it cited in its response to WRMC's summary judgment motion is also fruitless. As we observed before, the formula relied upon in *Dawson v. General Motors Corp.* to establish the lease rate was far simpler than that which Citadel relies upon here. (Op. 3/22/11 at 21 n.9.) 977 F.2d 369, 373 (7th Cir. 1992). The rate in *Dawson* was to be a function of the prior lease rate times three percent. *Id.* In this case, David Varwig's own testimony reflects the fact that the key variable in Citadel's formula, total project cost, was in fact a combination of many, many other variables. (Varwig Dep. at 56–57.) Furthermore, the parties in *Dawson* had a longstanding prior business relationship and course of dealing from which the court could infer assent to the terms of the alleged lease. 977 F.2d at 373. The same is not true here.

Citadel's attempt to reinvoke *Sonnenblick-Goldman Corp. v. Murphy* also does not change our view of its impact on this case. (Mot. at 7–8.) 420 F.2d 1169, 1173 (7th Cir. 1970). The principle for which Citadel cites that case is as follows: "The fact that the parties have left some matters to be determined in the future should not prevent enforcement, if some method of determination independent of a party's mere 'wish, will, and desire' exists[.]" *Id.* And yet, immediately prior to invoking this language, Citadel had just been arguing that it was up to Citadel to "decide[] on the building and build-out allowance it wanted[.]" (Mot. at 8.) That sounds a lot like a party's "mere 'wish, will, and desire[.]'" Indeed, according to Citadel's reading of the agreement, WRMC could have just as easily decided it wanted a small clinic that was, say, only 2,000 square feet, which Citadel would have been obligated to build and own for

sixty years. Common sense suggests, however, that Citadel would not have been willing to undertake the time and trouble of facilitating the construction of such a small facility from several hundred miles away. Thus, unlike in *Sonnenblick*, Citadel's formula is dependent upon, among other things, the "mere 'wish, will, and desire'" of one of the parties. 420 F.2d at 1173.

Lastly, our order does not, as Citadel implies, render the agreement between Citadel and WRMC unenforceable. (Mot. at 9.) Instead, all our order does is recognize that the scope of their agreement does not include the ground and space leases essential to Citadel's claim for lost profits. Citadel can still seek to recover damages under Count I for WRMC's alleged failure to cover certain costs specified in the Authorization to Proceed. Thus, the parties' agreement is not unenforceable; it just does not include lost profits. For this reason, Citadel's motion to consider our grant of summary judgment on Count II is denied.

**B. Count III**

Citadel also attempts to revive Count III of its amended complaint, which we dismissed with prejudice on May 13, 2009. (Op. 5/13/09 at 17–20.) In Count III, Citadel alleged that WRMC "breach[ed] the covenant of good faith and fair dealing" in its negotiations with Citadel. (Am. Comp. at 5.) Illinois law distinguishes between the *covenant* of good faith and fair dealing in the performance of contracts and the *duty* to negotiate in good faith prior to contract formation. *See Voyles v. Sandia Mortgage Corp.*, 196 Ill.2d 288, 294–295, 751 N.E.2d 1126, 1131–1132 (Ill. 2001) (declining to create an independent cause of action for a breach of the covenant of good faith outside a narrow insurance context); *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.*, 873 F.2d 155, 158–160 (7th Cir. 1989) (discussing the duty to negotiate in good faith). A breach of the *covenant* of good faith is not an

independent cause of action and is remediable only through a breach of contract action. *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 628 (7th Cir. 2002) (citing *Voyles*, 196 Ill.2d at 296, 751 N.E.2d at 1131–1132.) A breach of the *duty* of good faith is an independent cause of action in tort that only arises where parties to a preliminary agreement have explicitly assumed a duty to negotiate in good faith towards a final agreement. *A/S Apothekernes*, 873 F.2d at 158–160. We dismissed Count III for failing to state a claim under either of these theories. (Op. 5/13/09 at 17–19.)

First, we determined that the agreement between WRMC and Citadel did not give rise to a duty to negotiate in good faith. (*Id.* at 18.) As Illinois courts have made clear, the duty to negotiate in good faith must be established, if at all, by the terms of the parties' preliminary agreement. (*Id.*) *See Milex Products, Inc. v. ALRA Laboratories, Inc.*, 237 Ill. App. 3d 177, 189, 603 N.E.2d 1226, 1235 (2d Dist. 1992); *A/S Apothekernes*, 873 F.2d at 159. Because Citadel could not point to any provision establishing such a duty in its agreement with WRMC, we held that it had not stated a claim upon which relief could be granted. (Op. 5/13/09 at 18.) Second, we also held that Citadel's allegation of WRMC's breach of the "covenant of good faith and fair dealing" was remediable only through an action for breach of contract, not as a separate cause of action. (*Id.* at 19 (citing *Voyles*, 196 Ill.2d at 296, 751 N.E.2d at 1131).)

Citadel now asks us to reconsider the dismissal of Count III. (Mot. at 10–17.) Although Citadel does not say so, we assume that it moves for reconsideration pursuant to Rule 60(b). Fed. R. Civ. P. 60(b). Unlike our grant of summary judgment on Count II, which we entered on March 22, 2011, the time has long since passed for Citadel to bring its motion regarding Count III under Rule 59(e). Rule 59(e) requires motions to reconsider to be brought "no later than 28

days after the entry of the judgment." *Id.* 59(e). We entered judgment with respect to Count III on May 13, 2009. Thus, we review Citadel's motion to reconsider our dismissal of Count III according to Rule 60(b).

Rule 60(b) is similar to Rule 59(e) in that it enables a party to seek relief from a court's order. *Starr v. Levin*, No. 02-C-2258, 2002 WL 31664496, at *1 (N.D. Ill. Nov. 24, 2002). Rule 60(b), however, is considerably narrower than Rule 59(e). *U.S. v. Manville Sales Corp.*, No. 88-C-630, 2005 WL 526695, at *2 (N.D. Ill. Mar. 2, 2005). Rule 60(b) identifies six specific situations in which a motion to alter or amend a judgment may be brought. They are:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . . misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). It is well-established that Rule 60(b) relief is "an extraordinary remedy and is granted in only exceptional circumstances." *Nodal Sys. Corp. v. Burke*, No. 00-C-2392, 2001 WL 664394, at * 2 (N.D. Ill. June 13, 2001) (citing *Harold Washington Party v. Cook County, Ill. Democratic Party*, 984 F.2d 875, 879 (7th Cir. 1993)).

Although Citadel is again notably silent about the specific grounds upon which it bases its motion to reconsider our dismissal of Count III, we presume it seeks relief under the catch-all provision of Rule 60(b)(6), which allows reconsideration based on "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). We make this presumption because Citadel is time-barred from relying on the first three grounds for relief. Motions relying on these grounds must be brought, if at all, "no more than a year after entry of the judgment or order[.]" *Id.* (c)(1).

Furthermore, Citadel's reason for seeking relief is that "[n]ow that the Court has ruled against Citadel on Count II, the relevance [of] Citadel's alternative claim in Count III is apparent[.]" (Reply at 9.) It is difficult to determine which category under Rule 60(b), if any, this explanation invokes, but the broad wording of subsection (b)(6) makes it the most likely candidate.

In any event, Citadel's argument for reinstating Count III appears to be that, even if the final leaseback deal with WRMC was never consummated, WRMC's conduct in "[going] ahead and [doing] the same project on its own, cutting Citadel out" is a violation of the duty to negotiate in good faith supposedly established by the Authorization to Proceed.[1] The duty to negotiate in good faith prevents a party to a preliminary agreement from "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *A/S Apothekernes*, 873 F.2d at 158. An example of how this duty might be breached would be where a party "unreasonably insist[s] on a condition outside the scope of the parties' preliminary agreement, especially where such insistence is a thinly disguised pretext for scotching the deal because of an unfavorable change in market conditions." *Id.* In this vein, Citadel argues that "WRMC dropped Citadel not because of any failure by Citadel, but rather simply because it decided it could do better without Citadel, after Citadel had done all of the work." (Mot. at 11.)

But Citadel's argument misconstrues the duty to negotiate in good faith. The Seventh Circuit has made clear that "[a] duty to *negotiate* in good faith does not encompass an automatic

---

[1] In its motion, Citadel seems to be invoking the tort-based duty to negotiate in good faith. This is true even though the amended complaint referred to WRMC's alleged breach of "the covenant of good faith and fair dealing," which, as discussed, arises from contract law. Based on the thrust of Citadel's argument in its motion, however, we analyze Count III according to the tort-based cause of action.

-11-

duty to approve the final deal." *A/S Apothekernes*, 873 F.2d at 159 (emphasis original). The Seventh Circuit has also determined that "one cannot characterize self-interest as bad faith" in business negotiations, even where the negotiating parties have entered some preliminary agreement regarding their negotiations. *Id.* (quoting *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1223 (7th Cir. 1988)). And yet, characterizing WRMC's admittedly self-interested action as bad faith is exactly what Citadel seeks to do in attempting to reinstate Count III. Indeed, it is undisputed that the reason WRMC decided not to close the deal with Citadel was that the original basis for WRMC's interest in a leaseback arrangement with a third-party developer was no longer relevant. (Mot. at 10.) As WRMC's Vice President Tami Hutchison testified, WRMC's concerns about the amount of debt on its balance sheet had ebbed. (Citadel's 56.1 Facts ¶ 29.) Thus, there was no need to enter a sixty-year relationship with an outside party in order to construct the building. WRMC could simply build the building on its own without having to execute multiple leases with a third-party developer.

Citadel's contention that WRMC somehow left Citadel high and dry after Citadel had "done all of the work" is also unfounded. (Mot. at 11.) What WRMC initially sought from Citadel was the ability to construct the building through a leaseback arrangement. WRMC was not hiring Citadel to construct the building under any arrangement, whether of the leaseback variety or otherwise. Although we drew an inference in Citadel's favor at the motion to dismiss stage that the sparse terms of the Authorization to Proceed did not preclude the possibility that WRMC was bound to develop the building with Citadel or not at all, the factual record developed since that stage has revealed that inference to be entirely unfounded. (Op. 5/13/09 at 16.) Again, WRMC's intent in first seeking out Citadel's services was to enter in to a leaseback

arrangement so as to construct the building without incurring additional debt on its balance sheet. (Citadel's 56.1 Facts ¶ 1.) Once WRMC's concern about its debt disappeared, it no longer required Citadel's services. Because WRMC had not closed the leaseback deal with Citadel, WRMC was entitled to make this decision without being obligated to compensate Citadel beyond the specific costs outlined in the Authorization to Proceed. Thus, WRMC did not use Citadel; instead, it merely opted not to accept what Citadel was offering—that is, the leaseback arrangement.[2] As the Seventh Circuit has made clear, this type of self-interested decision-making is not bad faith but is instead "the essence of bargaining and the free market." *A/S Apothekernes*, 873 F.2d at 159 (quoting *Feldman*, 850 F.2d at 1223).

As before, Citadel has also failed to point with any specificity to any duty of good faith created by the Authorization to Proceed that WRMC somehow breached. (*See* Op. 5/13/09 at 18.) Courts have made clear that any duty to negotiate in good faith must arise by the terms of the preliminary agreement. *See Milex Products*, 237 Ill. App. 3d at 189, 603 N.E.2d at 1235; *A/S Apothekernes*, 873 F.2d at 159. Citadel attempts to infer this duty from the statement in the Authorization to Proceed in which WRMC "authorize[d] Citadel Group Limited to proceed with Project development." (Mot. at 10.) But this vague language makes it difficult to discern what, if any, obligations existed between the parties regarding their negotiations.

---

[2] Citadel also attempts to analogize WRMC's termination of Citadel to firing a broker immediately before the closing of a transaction in order to avoid paying an otherwise applicable commission. (Mot. at 14 (citing *Air Support Int'l, Inc. v. Atlas Air, Inc.*, 54 F. Supp. 2d 158, 167 (E.D.N.Y. 1999).) This comparison is baseless, however, because the transaction WRMC actually completed in building the building without Citadel was materially different than the transaction WRMC was contemplating with Citadel. As indicated, WRMC was initially interested in a leaseback arrangement with a third-party developer. Ultimately, however, WRMC chose not to enter in to a leaseback arrangement with an outside developer at all.

Other cases in which courts have found a duty to negotiate in good faith have done so based on far more specific terms. For instance, in *Evans, Inc. v. Tiffany & Co.*, upon which Citadel places substantial weight, the court found numerous instances in which the party alleged to have exercised bad faith had initially agreed to certain terms in writing and later sought to renegotiate those terms to its own advantage. 416 F. Supp. 224, 234–238 (N.D. Ill. 1976). Similarly, in *Milex Products*, a pharmaceutical company had reached an agreement with another company to manufacture a pharmaceutical for which the patent was due to expire. 237 Ill. App. 3d at 179–80, 603 N.E.2d at 1228–29. But given the length of time required for the Food and Drug Administration approval process, the parties left the price term open for subsequent negotiations in order to accurately account for inflation. *Id.* Once the approval process had concluded, the would-be manufacturer sought to impose several additional conditions on the pharmaceutical company. In the court's view, the manufacturer "tried to take advantage of the situation to force [the pharmaceutical company] to accept terms that had not been contemplated in the original contract[.]" *Id.* at 189–90, 603 N.E.2d at 1235.

Here, Citadel attempts to paint Hutchison's request for a "fair market" lease rate as an attempt to introduce a new term to the negotiations in an effort to derail them. (Mot. at 13.) But unlike the defendant in *Evans*, WRMC was not seeking to renegotiate previously agreed upon terms, because the only lease rates in any document to which WRMC arguably assented were expressly preliminary. 416 F. Supp. at 234–238. Similarly, WRMC was not seeking to exploit its position in the wake of a lengthy administrative approval process to add additional, burdensome terms to those previously agreed upon, as was the case in *Milex Products*. 237 at 189–90, 603 N.E.2d at 1235. In fact, Varwig testified that he did not understand Hutchison's

request for a fair market lease rate to be adding anything new to the negotiations. (WRMC's 56.1 Facts ¶ 43.) We see no justification for revisiting our prior dismissal of Count III of Citadel's amended complaint.

### III.  CONCLUSION

We deny Citadel's motion to reconsider our grant of summary judgment for WRMC on Count II.  We also deny Citadel's motion to reconsider our previous dismissal of Count III.  It is so ordered.

_____
Honorable Marvin E. Aspen
U.S. District Court Judge

Date: May 12, 2011